# Exhibit

# 3

## In The Matter Of:

*Kavitha Ginjupalli, D.D.S. v.*
*Provident Life and Accident Insurance Company*

---

*Anthony Scuderi*
*March 29, 2017*
*Video Deposition*

---

*195 State Street • Boston, MA 02109*
*888.825.3376 - 617.399.0130*
*Global Solutions*
*court-reporting.com*



Original File Anthony Scuderi 3-29-17.txt
Min-U-Script® with Word Index

1    files.

2         Q.    What kind of clinical consultants?

3         A.    Nurses, RNs.

4         Q.    Okay.  And you did that for how long?

5         A.    Until January 1, 2016.

6         Q.    Then what was your job, January 1,

7    2016?

8         A.    Assistant vice president of individual

9    disability benefits.

10        Q.    During the time you were a clinical

11   vocational director, was that the same level, in

12   terms of your employment at Unum as the claims

13   director, or was that a promotion?

14        A.    It was the same level, I believe.

15        Q.    Then January 1, 2016 you became an

16   AVP; was that a promotion?

17        A.    It was.

18        Q.    And then how long were you in that

19   job?

20        A.    Until the end of October 2016.

21   ███   ████████████████████████████████

███   ███   ███████████████████████████████

███   ███   ████████████████████████████████████

███   ██████████████████████████

1    a month, less than once a month?

2         A.   Can't even define it.  It was

3    irregular.

4         Q.   Did you ever discuss the information

5    in those reports that showed the forecast

6    recoveries in dollar amounts with your directors?

7         A.   I did.

8         Q.   What would be the nature of those

9    conversations?

10        A.   We would do a weekly check in,

11   verbally.

12        Q.   Okay.  And what would be the nature of

13   that conversation?

14        A.   It would just be an update in relation

15   to where we stand, in relation to where were

16   projecting we'd be.

17        Q.   So, in terms of where you stood versus

18   where you were projected to be, where did those

19   projections come from?

20        A.   I would receive those from Maureen.

21        Q.   Okay.

22        A.   Or Scott, my previous manager.

23        Q.   Do you recall what was in those

24   projections?

Case 3:19-cv-00649   Document 1-3   Filed 07/30/19   Page 4 of 21 PageID #: 39

1       A.   It was usually a dollar and account

2  number, in relation to where our portfolio claims

3  were expected to be given, our historical

4  expectations.

5       Q.   Do you recall what that dollar amount

6  was, in general terms?

7       A.   I do not.

8       Q.   Was it more than $50?

9       A.   I can't speculate an amount.  I'm

10  sorry, I can't.

11       Q.   Where would we find that information

12  to refresh your memory?

13       A.   I assume it would be an actuarial

14  calculation, so.

15       Q.   How was it given to you?

16       A.   Usually verbally.

17       Q.   By?

18       A.   My supervisor at the time, either

19  Maureen or Scott.

20       Q.   Okay.  When you had that discussion

21  with them, did you ever write those numbers down?

22       A.   I did.

23       Q.   What did you do with those documents?

24       A.   I kept them on a document on my Excel

1  spreadsheet on my computer.

2       Q.  Okay.  Was that an Excel spreadsheet

3  that you added to or that you've replaced numbers

4  on as you went along?

5       A.  Trying to recall.  I think I may have

6  replaced.

7       Q.  Was this an Excel spreadsheet

8  available on the network or just on your

9  computer?

10       A.  It was on just my computer.

11       Q.  Did anyone else have access to it?

12       A.  No, they did not.

13       Q.  Okay.  What information did you have

14  on that Excel spreadsheet?

15       A.  I kept information on claims that were

16  identified as potential claims that were

17  forecasted for recovery.

18       Q.  Did that include the name of the

19  insured?

20       A.  It did.

21       Q.  Did it include the claim number?

22       A.  It did not.

23       Q.  In addition to the name for the

24  insured, did it contain the dollar amount for

Case 3:19-cv-00649   Document 1-3   Filed 07/30/19   Page 6 of 21 PageID #: 41

1   that insured?

2          A.    Dollar amount in relation to?

3          Q.    The recovery?

4          A.    It contained the reserve information,

5   yes.

6          Q.    Did it contain the reserve information

7   for each individual insured that was on that

8   spreadsheet?

9          A.    It did.

10          Q.    Did you also have totals for groups of

11   those insureds on the spreadsheet, or did you

12   just keep it individually?

13          A.    I had an aggregate number.

14          Q.    Okay.  Did you also have what the

15   forecast historic measures were on that

16   spreadsheet?

17          A.    I did.

18          Q.    Did you have any other information on

19   that spreadsheet, in terms of the calculations or

20   the status of the claims?

21          A.    Not to my recollection.

22          Q.    Do you remember when you first started

23   using that spreadsheet?

24          A.    I probably used it when I was the

1       A.   The day I left the company.   Would it
2   be an okay time to ask for a break?
3              MR. SHEA:   Yes.
4       Q.   Actually, that's probably a very good
5   time.
6              THE VIDEOGRAPHER:   We're now going
7   off the record at 10:49 a.m.
8              (Thereupon, there was a short
9   recess taken.)
10             THE VIDEOGRAPHER:   One moment,
11  please.   We are back on the record at 10:59 a.m.
12      Q.   Mr. Scuderi, just to keep us back on
13  track, let me see if I can follow up on a couple
14  things we were just talking about.
15             Did you ever get a report from
16  someone else that had an insureds name on it and
17  a reserve amount related to recoveries?
18      A.   I did.
19      Q.   And what would be the nature of that
20  report?
21      A.   It was the change in status report.
22      Q.   Okay.   And who did you get that from?
23      A.   I typically received it from my
24  supervisor's administrative assistant.

1        Q.    And when you say your supervisor, you

2   mean Maureen Griffin or?

3        A.    Scott Williams.

4        Q.    Scott Williams.  Do you remember the

5   name of their administrative assistants?

6        A.    I do.  Tammy Goodney.

7        Q.    And which one was she?

8        A.    She was Maureen's.

9        Q.    Okay.

10        A.    And Kim Lebow.

11        Q.    Okay.

12        A.    She was Scott's.

13        Q.    Now that we got that straightened out,

14   let's go back to what you were telling me.

15              So, you got the change in status

16   report from the administrative assistant?

17        A.    Correct.

18        Q.    Was that emailed to you or given to

19   you as a piece of paper, or more than one sheet?

20        A.    It was a document on a piece of paper,

21   could be multiple pieces of paper.

22        Q.    Do you recall about how often they

23   gave you those reports?

24        A.    Once a month.

1          Q.    And what was on that report, do you

2    recall?

3          A.    To the best of my recollection, it was

4    an insurer's name, a claim number, and the

5    reserve associated with it.

6          Q.    Were these generally limited to people

7    who were currently on claim, or did it include

8    claims that had been filed, but the insured had

9    not been paid anything yet, or is it mixed?

10         A.    It could be mixed.

11         Q.    Okay.  Have you heard of something

12   called a paid recovery plan?

13         A.    I haven't heard of that term,

14   specifically, no, but I've heard of the term

15   plan, yes.

16         Q.    What does that mean to you in that

17   context of recoveries?

18         A.    It would be basically, in my context,

19   what my portfolio of claims would expect to yield

20   from a paid recovery perspective based upon

21   historical performance.

22         Q.    And who would you share that

23   information with?

24         A.    I would delineate that information to

1   my direct reports for their individual teams.

2        Q.    Verbally, by email, by paper; what did

3   you do?

4        A.    Verbally.

5        Q.    Did you ever give them that

6   information on a piece of paper?

7        A.    I did not.

8        Q.    How would they know which claims you

9   were interested in or were discussing with them?

10                MR. SHEA:   Objection.  Vague.  No

11   foundation.

12        A.    The claims I received were usually

13   ones that were populated by them, so I would

14   assume they would have knowledge of that.

15        Q.    Okay.  So, when you disseminated the

16   information to them, did you discuss particular

17   insureds?

18        A.    Not at that particular time, no.

19        Q.    Did you discuss it at other times?

20        A.    They would provide me updates on

21   occasion.

22        Q.    In terms of the recoveries that you

23   were discussing with them, how did they know

24   which claims you were discussing?

1              MR. SHEA:  Objection.  Vague.

2         A.    If there was a particular claim that I

3    had a question about, I would refer to the

4    insured's name.

5         Q.    Okay.  In a typical month, do you

6    recall how many insureds would be on that list?

7         A.    I don't.

8         Q.    More than ten?

9         A.    I don't know a number.

10        Q.    Was it more than two sheets?

11        A.    It could have been.

12        Q.    Was there at times it was more than

13   two sheets of information?

14        A.    Can't recall specifically.

15        Q.    Where would we find these documents to

16   refresh your memory?

17        A.    I'm not certain if they're available

18   anymore.

19        Q.    So, going back to what you said

20   earlier, you got these reports from Maureen

21   Griffin or from Scott Williams?

22        A.    Which report are you referring to?

23        Q.    The one you just told me about, the

24   one that had the --

1                    MR. SHEA:  Objection.  I think it

2    mischaracterizes his original testimony.

3         A.    I think I informed you that I received

4    it from their administrative assistant.

5         Q.    Oh, I'm sorry.  That's a good point.

6    You got it from the administrative assistants.

7                    What did you do with that paper,

8    ultimately?  Describe the process.

9                    What did you do with it when you

10   got it from the administrative assistant?

11        A.    I would utilize it to populate my

12   spreadsheet --

13        Q.    Okay.

14        A.    -- that we talked about previously.

15        Q.    Okay.

16        A.    Then I would disseminate that

17   information to my directors as well.

18        Q.    Okay.  Then what did you do with that

19   sheet of paper?

20        A.    I ultimately would shred it.

21        Q.    Okay.  And just to clarify, this

22   document that you were given by the

23   administrative assistants did have individual

24   insured's name on it?

1        A.    It did.

2        Q.    And reserve information?

3        A.    It did.

4        Q.    Okay.  And you disseminated it to the

5    directors verbally though?

6        A.    I did.

7        Q.    To your knowledge, did anybody ever

8    make a copy of those sheets, once they were given

9    to you, the sheet was in your possession?

10       A.    Not to my knowledge.

11       Q.    Okay.  Were you aware of whether or

12   not similar sheets were given to any of the other

13   AVPs?

14       A.    I would presume they were.

15       Q.    Were you ever there when that

16   happened?

17       A.    No, I was not.

18       Q.    How was it delivered from the

19   administrative assistants?  Did you go to them or

20   did they show up at your office, or how did that

21   work?

22       A.    It could've been either/or.

23       Q.    How long did you typically have those

24   sheets before you shredded them?

Case 3:19-cv-00649   Document 1-3   Filed 07/30/19   Page 14 of 21 PageID #: 49

1  administrative assistants gave you those reports,

2  did you ever have the occasion to go back and

3  discuss what was on those reports with Maureen

4  Griffin or with Scott Williams?

5      A.   Not in relation to specific claimants,

6  no.

7      Q.   Okay.  What about in relation to

8  either aggregate recoveries or any other metrics

9  having to do with recoveries?

10      A.   I did.

11      Q.   Can you describe those conversations?

12      A.   To the best of my recollection, it

13  would just be very general, in relation to, this

14  is where we're currently at from a paid recovery

15  perspective, and this is where we're expecting to

16  be.

17      Q.   The forecast that you were discussing

18  with her that you described earlier, was that

19  part of this conversation as well?

20      A.   That would be kind of ultimately,

21  based upon historical expectations, where our

22  blocks should perform to.  So, yes, that would be

23  a part of the discussion.

24      Q.   Okay.  So, would you describe it as a

 1                One could be an insured was
 2    expected to go back to work based upon, we have a
 3    statement from their doctor expecting them to go
 4    back to work in May or June.  So, that could be a
 5    reason.
 6                There could be a potential other
 7    plan discussion with a physician where a return
 8    to work plan is being discussed and the potential
 9    for an accelerated payment and closure of the
10    claim as well.  So, depending on the current
11    status of the claim.
12                There could be an independent
13    examination that's pending.  I don't know if it
14    would be an ongoing paid claim or not paid claim.
15    That could be another reason.
16         Q.   Okay.  When you disseminated the
17    information that you got originally from Maureen
18    Griffin's administrative assistant to your
19    directors, or Scott Williams' administrative
20    assistant to your directors, what did you talk to
21    them about?  What was in that conversation?
22                And especially in terms of the
23    historic forecast goals you talked about, I think
24    is how we'd call them.

1           A.   I would discuss with them, probably at
2     the beginning of the month, I would let them know
3     what their block was expected to produce.
4                And then once I did receive that
5     report, I would let them know, based upon what
6     they had forecasted what those claim's
7     approximate value were.
8           Q.   By expected to produce, what do you
9     mean by that?
10          A.   What the historical data would suggest
11    that from a paid recovery perspective, their
12    claim block should result in on a month to month
13    basis.
14          Q.   Was this in terms of dollars or number
15    of claims?
16          A.   Both.
17          Q.   So, part of what you would discuss was
18    the expected amount of dollars from recoveries
19    for that month, if I'm understanding you?
20          A.   That's correct.
21          Q.   Okay.  When a director's team wasn't
22    able to produce the number of recoveries in terms
23    of dollars to come close to those forecast
24    amounts, what was the result of that; what would

1  happen?

2        A.    Nothing.

3        Q.    What would happen over time?

4        A.    Nothing, to my recollection.

5        Q.    What was the point of the conversation

6  if nothing would happen?

7        A.    To let them know, in summary, where

8  they ended up in a particular month, but there

9  would be no punitive action taken against them.

10        Q.    If they did regularly meet those

11  levels, was there any additional reward for them?

12        A.    Not to my knowledge.

13        Q.    Why did you have the conversations

14  with them then?

15        A.    It was part of their assessment of

16  their overall performance, so it was important to

17  let them know about that, as well as other

18  performance metrics within their block of

19  business.

20        Q.    So, it did affect their assessment?

21        A.    It was a part of their assessment.

22        Q.    Is it fair to say it was a factor in

23  their assessment?

24        A.    I would say that, yeah, it's fair.

Case 3:19-cv-00649   Document 1-3   Filed 07/30/19   Page 18 of 21 PageID #: 53

1   17 of 103.

2                   And then further in the document,

3   it's 2 of 103, through 6 of 103, all part of the

4   same exhibit.

5                   Then on the very first page for

6   identification purposes, it has the title, "ID

7   Director, scorecard as of 3/31/2013."  You with

8   me now?

9        A.   I am.

10                  (ID Director Scorecard Exhibit 10

11  was marked for identification.)

12       Q.   Describe what that document is.

13       A.   This appears to be the ID director

14  scorecard that was for Sarah McKinnen.

15       Q.   Okay.  What was this used for?

16       A.   This contained information about a

17  particular director's block of business, captured

18  some service metrics and quality metrics.

19       Q.   Okay.  Were there other metrics that

20  applied to a director that were not captured on

21  here?

22       A.   There's not financial operational

23  metrics on the scorecard.

24       Q.   By financial operational metrics, what

1    do you mean?

2         A.   Anything relating to the results of

3    their teams, in relation to paid recoveries,

4    claims transferring, max ben settlements,

5    anything like that.

6         Q.   When you use the term 'operational

7    metrics,' give me your definition of that.

8         A.   I use that term in relation to the

9    count of metrics, in relation to dollars.

10        Q.   So, operational metrics would include

11   keeping track of recoveries?

12        A.   That would be one use of it.

13        Q.   Keeping track of paid recoveries?

14        A.   And other things as well, yup.

15        Q.   Would forecasting of recoveries be

16   part of operational metrics?

17        A.   I don't know if I consider that an

18   operational metric.

19        Q.   The amount that a director's team

20   recovered for a given month, would that be an

21   operational metric?

22        A.   I don't consider dollars an

23   operational metric.  I consider that a financial

24   metric.

```
 1              COMMONWEALTH OF MASSACHUSETTS
 2    Middlesex, ss
 3
 4         I, Victoria S. Reade, Professional Court
 5    Reporter and Notary Public in and for the
 6    Commonwealth of Massachusetts, do hereby certify
 7    that the witness whose deposition is hereinbefore
 8    set forth, was duly sworn by me and that such
 9    deposition is a true record of the testimony
10    given by the witness.
11         I further certify that I am neither related
12    to nor employed by any of the parties in or
13    counsel to this action, nor am I financially
14    interested in this     action.
15         In witness whereof, I have hereunto set my
16    hand and affixed my seal on this 11th day of
17    April 2016.
18
19
20                        Victoria S. Reade
21                        NOTARY PUBLIC
22                        My Commission Expires:
23                        August 30, 2021
24
```