# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| MARGARET BOERSMA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:19-cv-0649 |
| ) | Judge Aleta A. Trauger |
| UNUM LIFE INSURANCE COMPANY ) | |
| OF AMERICA and UNUM GROUP ) | |
| CORP., ) | |
| ) | |
| Defendants. ) | |
| ) | |

## MEMORANDUM

Unum Life Insurance Company of America and Unum Group Corporation (collectively, "Unum") have filed a Motion for Judgment on the Administrative Record (Doc. No. 44), to which Margaret Boersma has filed a Response (Doc. No. 50), and Unum has filed a Reply (Doc. No. 52). Boersma has filed her own Motion for Judgment on ERISA Record (Doc. No. 46), to which Unum has filed a Response (Doc. No. 49), and Boersma has filed a Reply (Doc. No. 51). For the reasons set out herein, Boersma's motion will be granted and the defendants' motion will be denied.

## I. BACKGROUND

This action—brought under the civil enforcement provisions of the Employee Retirement Income Security Act, 29 U.S.C. § 1132 *et seq.* ("ERISA")—concerns the denial of Boersma's long term disability ("LTD") benefits and life insurance coverage with waiver of premium on account of disability ("LWOP") under the Long Term Disability Plan ("LTD Plan") and Life Insurance Plan ("LI Plan") of Boersma's former employer, FleetCor, Inc. ("FleetCor"). Unum is the claims administrator of the Plan.

1

**A. Applicable Plan Provisions**

>The LTD Plan defines "disability" as follows:
>
>You are disabled when Unum determines that:
>
>(1) you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and
>
>(2) you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.
>
>After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

(LTDR[1] at 125.) "Material and substantial duties" are defined as those that "are normally required for the performance of your regular occupation" and "cannot be reasonably omitted or modified." (*Id.* at 144.) The beneficiary's "[r]egular occupation" is the occupation that the beneficiary is "routinely performing when [her] disability begins." (*Id.* at 145.) When determining the duties of that occupation, however, the Plan provides that "Unum will look at [the beneficiary's] occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location." (*Id.*) The defendants concede that the LTD Plan "does not afford Unum Life discretionary authority to determine benefit eligibility." (Doc. No. 45 at 14.)

The LI Plan provides the following explanation regarding waiver of premiums based on disability: "Unum does not require premium payments for an insured employee's life coverage if he or she is under age 60 and disabled for 9 months. Proof of disability, provided at the insured

---

[1] There are two administrative records in this case, one for each type of benefits at issue, although most of the key information can be found in the record associated with the LTD benefits. That record—which the court will cite as the "LTDR"—can be found at Doc. Nos. 18, 18-1 and 18-2. There are two records related to the LWOP—which the court will refer to as "LWOPR1" and "LWOPR2"—that can be found at Doc. Nos. 18-3 and 18-4, respectively. The court will cite to the concluding digits of the Bates numbers of either record.

2

employee's expense, must be filed by the insured employee and approved by Unum." (LWOPR2 at 40.) The LI Plan defines disability as follows:

> You are disabled when Unum determines that:
>
> - during the elimination period, you are not working in any occupation due to your injury or sickness; and
>
> - after the elimination period, due to the same injury or sickness, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by training, education or experience.

(*Id.* at 56.) As with the LTD Plan, the defendants concede that the LI Plan does not grant Unum discretion to interpret or apply the plan. (Doc. No. 15 at 2.)

## B. Boersma's Medical and Benefits History

When Boersma, who is in her forties, worked for FleetCor, she held a position that, the parties agree, can at least generally be described as "director of operations." (LTDR at 653.) Her job was, in the parlance of occupational assessment, a "top executive" position, which, according to the administrative record, entails the following:

> Top executives work in nearly every industry. They work for both small and large businesses, ranging from companies in which they are the only employee to firms with hundreds of thousands of employees. Top executives often work many hours, including evenings and weekends. In 2016, about half worked more than 40 hours per week . Travel is common, particularly for chief executives.

(*Id.*) Top executive positions typically involve "[s]edentary work" requiring the executive to "[d]irect[], control[], or plan[] activities of others," "[m]ak[e] judgments and decisions," and, generally, "[p]erform[] a variety of duties." (*Id.*)

Boersma came to suffer from symptoms, including severe joint and muscle pain and fatigue, principally attributed to fibromyalgia and seronegative rheumatoid arthritis.[2] After

---

[2] A number of different conditions and symptoms appear in Boersma's medical records. The court will focus on arthritis and fibromyalgia, because those are the conditions on which Boersma now bases her disability claims.

3

struggling to fulfill the demands of her executive position while living with her pain (as well as the disruptive side effects of medications used to treat her conditions), Boersma stopped working for FleetCor on October 5, 2017, and received short-term disability benefits from the company. She eventually applied for LTD benefits, and Unum informed Boersma that it would begin paying the benefits under reservation of right, while it considered her claim. (*Id.* at 2.)

In support of her claim, Boersma submitted a statement from her treating family practitioner, Dr. Meghan Gannon. Gannon stated that, due to Boersma's conditions, Boersma was unable to type or write for extended periods of time or participate in long calls or meetings without experiencing fatigue. (*Id.* at 104.) She also stated that Boersma "will not be able to multi-task and handle high stress situations [or] travel." (*Id.* at 467.) Boersma's treating rheumatologist, Dr. Susan Hartwell, provided records in connection with the claim but initially informed Unum that she "do[es] not do functional assessments." (*Id.* at 368.)

Unum reviewers, including Unum onsite physician Dr. Tammy Lovette, evaluated Boersma's records. Following that initial review, they concluded that "[t]he available information d[id] not indicate [Boersma] would be precluded from sedentary functionality . . . due to minimal exam findings." (*Id.* at 449.) The "minimal exam findings" appears to refer to the relative lack of physical findings corroborative of disabling symptoms. For example, an October 2, 2017 examination by Dr. Harwell had found that Boersma's strength, gait, and posture were normal and had not found any swelling in Boersma's extremities. (*Id.* at 449.) Dr. Lovette performed a second review of the records after having a phone conversation with Dr. Gannon, in which Dr. Gannon reiterated her belief that Boersma's symptoms were disabling and said that,

prior to Boersma's disability, Boersma was "the hardest working woman she knows."[3] (*Id.* at 592, 732.) Dr. Gannon also told Dr. Lovette that Boersma, in fact, had had significant observable swelling when her disease symptoms first surfaced. (*Id.* at 732.)

In her review, Dr. Lovette summarized the available information regarding Boersma as follows:

> Ms. Boersma has a history of seronegative [rheumatoid arthritis] diagnosed in 2013 that has been treated with multiple medications. Dr. Gannon notes there was a long period where steroids were required in the past as well as frequent work absences (prior to this claim). Ms. Boersma reports hand swelling and morning stiffness. However, exams have been largely unremarkable. Inflammatory markers were normal on Plaquenil. There is no recent imaging but prior hand x-rays in 2014 showed mild joint space narrowing in the fingers and soft tissue swelling. Her current rheumatologist notes that fibromyalgia is complicating her pain. Ms. Boersma has also been diagnosed with peripheral neuropathy based on reported extremity numbness and tingling symptoms. Prior electrodiagnostics were normal and most recently the neurologist noted no sensory deficits on exam. Repeat electrodiagnostics report and skin biopsy is pending.
>
> There are consistent complaints of fatigue and pain and aggressive treatment for [rheumatoid arthritis] and peripheral neuropathy, yet labs and exams are not remarkable. Rheumatological evaluation would be helpful in evaluating functionality . . . .

(*Id.* at 733–34.) Dr. Lovette concluded, based on her reviews and her conversation with Dr. Gannon, that it was "[u]ncertain" whether Boersma's condition resulted in vocational restrictions and limitations. (*Id.* at 733.) Dr. Lovette recommended an independent medical examination ("IME") of Boersma to further assess her symptoms. (*Id.* at 734.) In the meantime, Boersma supplemented her file with some of the materials that had not yet been available. Specifically, she added electrodiagnostic results that showed evidence of mild bilateral carpal tunnel syndrome and a biopsy report showing significantly reduced epidermal nerve fiber density, consistent with neuropathy in her thigh and calf. (*Id.* at 1183–91.) Lovette reviewed the materials

---

[3] The defendants note that Dr. Gannon also revealed, during that phone call, that she treats Boersma's entire family and that Boersma's daughter babysits for Dr. Gannon. According to Dr. Lovette's notes, Dr. Gannon has a "concierge type practice." (LTDR at 732.)

and wrote that, "[w]hile testing does indicate small fiber neuropathy, this diagnosis does not necessarily [imply] loss of functionality and must be evaluated in context of symptoms and clinical findings, of which there can be a wide spectrum." (*Id.* at 1198.)

On May 4, 2018, an IME was performed by Dr. Neha Pansuria, a rheumatologist employed by third-party IME provider Dane Street, LLC. (*Id.* at 1572, 1582–92.) According to Dr. Pansuria's report, she performed a full musculoskeletal physical examination of Boersma, including range of motion testing and examination for tenderness in all of Boersma's significant joints, and found that Boersma demonstrated a full range of motion but experienced tenderness in eight out of eighteen joints. (*Id.* at 1590.) Boersma, however, has introduced into the administrative record a sworn Declaration stating that Dr. Pansuria did not physically touch any part of Boersma's body other than her hands. Boersma also claims that Dr. Pansuria's report misstated the duration of Boersma's reported morning joint stiffness—which Dr. Pansuria described as lasting from 10 to 30 minutes, despite the fact that, according to Boersma, she told Dr. Pansuria that the stiffness lasts for "at least an hour." (*Id.* at 2670.)

In her report, Dr. Pansuria wrote that she found Boersma to have normal strength, reflexes, and fine motor control of her fingers, with no evidence of warmth or swelling on her reportedly tender joints. (*Id.* at 1590.) She suggested that Boersma's "[j]erking response on hands prior to touching with anxiety shows over-exacerbated response." (*Id.*) Dr. Pansuria noted that, although Boersma had been diagnosed with seronegative rheumatoid arthritis and "ha[d] subjective complaints of musculoskeletal pain symptoms as well as widespread physical complaints," she lacked the observable physical symptoms that would often be associated with arthritis; specifically, Boersma had "no objective evidence on physical examination for swelling, synovitis or limitation of range of motion on any joints and no serologic evidence of an

inflammation with normal C-reactive protein." (*Id.*) Dr. Pansuria also concluded that Boersma's history of not responding to medication directed at arthritis "clearly suggests her subjective complaints [were] less likely related to [rheumatoid arthritis] pathology" than other potential explanations. (*Id.*) Dr. Pansuria wrote that she "agreed with Dr. Harwell" that Boersma's "symptomatology goes for fibromyalgia [rather] than rheumatoid arthritis." (*Id.*) On the topic of Boersma's fibromyalgia symptoms, Dr. Pansuria wrote:

> [Boersma] presents with fibromyalgia symptoms including widespread musculoskeletal complaints, numbness, tingling, fatigue, poor sleep, irritable bowel syndrome and skin biopsy showing small fiber neuropathy. (A research study showed that [a] subset of patients with fibromyalgia have skin biopsy finding[s] of small fiber neuropathy.) . . . Understanding her fibromyalgia, she needs good support system[s] at home and work.

(*Id.*)

> Regarding possible work limitations, Dr. Pansuria concluded:
>
> [S]he has to take frequent breaks with stretching exercises, relaxation techniques to carry out her day at work and home. In my opinion, the weight of the medical evidence does not preclude her from the sedentary-level work, mostly sitting, while standing, walking for brief period of time, lifting, carrying, pushing, pulling up to 10 pounds occasionally, frequent travel. Break periods as needed, sit down for 15 minutes during each 1 hour.

(*Id.* at 1591.) In the ensuing months, Unum continued to compile medical records, and Dr. Pansuria authored an addendum to her report, in which she stated that her conclusions were unchanged. (*Id.* at 2059–62.) Unum Senior Vocational Rehabilitation Consultant Kelli Pickett reviewed Dr. Pansuria's findings and concluded that the relatively minor restrictions and limitations recommended by Dr. Pansuria would not prevent Boersma from continuing to perform her occupation. (*Id.* at 2068.)

Unum denied Boersma's LTD and LWOP benefits by letters dated August 27, 2018. (*Id.* at 2079–84; LWOPR1 at 489–93.) Boersma appealed the decision. In support of her appeal, she

7

provided her medical records, sworn statements, and the results of a functional capacity evaluation ("FCE"). (LTDR at 2217–22.) She included a letter from Dr. Hartwell stating:

> [Boersma's] conditions are debilitating. Her rheumatoid arthritis causes chronic hand pain and morning difficulty. What may be even more debilitating than this is fibromyalgia. Due to this condition, she has difficulty carrying out activities of daily living, much less the rigors of a demanding full-time job. She suffers with debilitating fatigue, pain, brain fog, all associated with her medical conditions. These would make her ability to carry out rigorous employment difficult, if not impossible.

(*Id.* at 2573.) Boersma also provided a letter from Dr. Gannon, stating:

> [I]t is my conclusion that Margaret will not be able to resume a 5 day/week in-office schedule in the future. She may be able to resume one to two days a week if the business needs, but only if her health and symptoms allow her to do so. Margaret may not know until the morning whether or not she can travel to the office as her symptoms and side effects can flare with little to no warning.

(*Id.* at 2505–06.) Dr. Gannon noted that Boersma's limitations were due, not only to the symptoms of her conditions themselves, but also to side effects of medications that she takes to treat those conditions. Those side effects "include nausea, vomiting, diarrhea, dizziness, [and] drowsiness." (*Id.* at 2505.) In addition to the letter, Boersma provided a sworn statement by Dr. Gannon in which Dr. Gannon summarized her treatment of Boersma as well as Boersma's symptoms and conditions. Dr. Gannon stated that, since she started treating Boersma in 2010, Boersma had experienced a "significant decline" in health. (*Id.* at 2513.)

The FCE that Boersma obtained was performed by Christopher Ryan Humphreys, a physical therapist and certified functional evaluator at BenchMark Physical Therapy. (*Id.* at 2230–59.) The FCE report concluded, among other things, that Boersma "would be off-task . . . due to limitations and pain in an 8 hour workday more than 30% of the time." (*Id.* at 2232.) According to the report, Boersma "cannot walk one city block or more without rest or severe pain" and "requires an unscheduled break to recline or lie down frequently due to fatigue." (*Id.*)

Boersma described her symptoms herself in a sworn Declaration included in the record. She explained, "Some days I get out of bed and have to go straight back to bed because I am in so much pain." (*Id.* at 2669.) She described her pain as having a significant negative effect on her ability to reliably perform simple tasks, including parenting and work tasks. Among the various symptoms she described, Boersma stated that she has a recurring problem with her hands "swelling and locking up," including as a response to typing. (*Id.* at 2670.) She said that, although she used to be physically active, she would now be "in pain and bedridden the next two days" if she performed any exercise beyond "a short walk." (*Id.*) She also described confusion and memory problems, as well as potentially debilitating digestive issues related to her medications. (*Id.* at 2669–70.) Boersma also provided sworn Declarations from her husband, her mother-in-law, and a former coworker/supervisor confirming the severity of her symptoms, as well as the fact that, prior to the onset of symptoms, Boersma had been a dedicated and hard-working employee. (*Id.* at 2673–74, -2676, 2678–79.) The former coworker and supervisor, Rebecca Schwan, stated that, prior to her illness, Boersma was a "fantastic worker," who, when given a project, "would work until it was completed." (*Id.* at 2678.) After Boersma became sick, however, "[t]here were many days [when she] would come into work and be in tears because she was in so much pain," until, eventually, Boersma "was no longer able to be in a work environment due to her severe pain and her medication side effects." (*Id.* at 2678–79.)

On appeal, Unum obtained a record review by Dr. Scott Norris, a family and occupational medicine specialist employed by Unum. (*Id.* at 2741–44.) Dr. Norris concluded that Boersma's claim of disability was not supported. He wrote:

> I have considered all conditions individually and in aggregate, as well as the opinions of the insured's treating providers. With a reasonable degree of medical certainty, I find that the medical evidence that has been provided for review does not support [restrictions and limitations] that would have precluded the

9

> [employee] from performing sustained fulltime sedentary work from 10/5/17 to 8/27/18 . . . and beyond. . . . Examination findings were generally mild and not [consistent with] the severe level of pain-related impairment reported by the [employee]. Likewise, imaging and diagnostic tests showed mild findings. Finally, the [employee] reported continued joint pain that was attributed to seronegative RA despite a multitude of trials of appropriate therapy, yet examinations and imaging did not describe progression of findings [consistent with] refractory inflammatory arthritis.

(*Id.* at 2741.) Dr. Norris agreed with Dr. Pansuria that, in light of Boersma's lack of observable physical symptoms and her failure to respond to therapies, Boersma's symptomology was more consistent with fibromyalgia than rheumatoid arthritis. Dr. Norris added that fibromyalgia "would not preclude sedentary level work, and in fact, continuance of occupational activity would be indicated as part of a treatment plan for" fibromyalgia. (*Id.* at 2743.)

Dr. Norris acknowledged Boersma's documented neuropathy and her potential carpal tunnel syndrome but concluded that there was no evidence that either condition resulted in functional limitations. (*Id.*) Dr. Norris also reviewed the FCE obtained by Boersma, although he stated that it "was not time-relevant" because it was completed after the conclusion of the period covered by his medical review. (*Id.* at 2742.) Dr. Norris concluded that the FCE's findings were "inconsistent with the generally unremarkable examinations by treating providers and the minimal findings on imaging studies." (*Id.*) Dr. Norris contacted Dr. Harwell seeking clarification about supposed changes in her evaluation of Boersma, but Dr. Harwell apparently did not respond. (*Id.* at 2797.)

Unum affirmed the denial of LTD and LWOP benefits on the ground that Boersma did not have a condition that precluded her from performing her occupation. (*Id.* at 2791–2801.) On July 30, 2019, Boersma filed her Complaint in this court challenging the decision. (Doc. No. 1.) All parties now seek a judgment on the administrative record. (*See* Doc. Nos. 44 & 46.)

## II. LEGAL STANDARD

A denial of benefits challenged under ERISA is subject to *de novo* review unless the benefits plan gives the administrator discretionary authority in interpreting the plan and determining employee eligibility. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). "When applying a *de novo* standard in the ERISA context, the role of the court reviewing a denial of benefits 'is to determine whether the administrator made a correct decision.'" *Hoover v. Provident Life & Acc. Ins. Co.*, 290 F.3d 801, 808–09 (6th Cir. 2002) (quoting *Perry v. Simplicity Eng'g*, 900 F.2d 963, 965 (6th Cir. 1990)). "The review is limited to the record before the administrator," but "[t]he administrator's decision is accorded no deference or presumption of correctness." *Id.* (citing *Perry*, 900 F.2d at 966–67.)

## III. ANALYSIS

The defendants argue that they correctly denied Boersma's claims in light of her largely unremarkable physical exams and the general lack of evidence supporting her impairment, aside from her own self-reporting and the opinions of treating physicians with preexisting relationships with Boersma who appear to have relied on that self-reporting. As far as symptoms attributable solely to rheumatoid arthritis are concerned, that argument might be convincing. As multiple physicians observed, there are two factors that persuasively weigh against a conclusion that Boersma suffers from severe arthritis: first, she lacks any persistent physical manifestations of the disease, either in the form of imaging, testing, or demonstrably limited range of motion; and, second, her condition does not appear to have been meaningfully responsive to treatments that would be expected to have at least some positive effect. None of the physicians who did consider Boersma disabled offered a convincing account that would explain why Boersma would suffer such severe symptoms of arthritis while failing to physically manifest signs of the disease *or*

11

respond to therapies.

Boersma, however, does not claim to be disabled solely by arthritis. Like many patients who suffer from chronic pain, Boersma appears to have presented a diagnostic and treatment challenge, and her treating physicians seem to have been uncertain, at times, in determining what her symptoms should be attributed to. Ultimately, though, every reviewing physician—including those whose conclusions were favorable to the defendants—concluded that her symptoms, as described, were consistent with a diagnosis of fibromyalgia. As the Sixth Circuit has recognized, fibromyalgia is typically not a "medical condition[] that can be confirmed by objective testing," and fibromyalgia patients often "present no objectively alarming signs" of their condition other than their reported symptoms themselves. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007) (citing *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988)). Accordingly, the two pieces of information that most significantly undermine Boersma's potential arthritis diagnosis—her lack of physical manifestations and her unresponsiveness to arthritis-focused therapies—simply do not tell the court much, if anything, about the possibility that she may be suffering similarly debilitating pain related to fibromyalgia.

It is well-recognized that it is difficult to provide "objective evidence of fibromyalgia itself." *Huffaker v. Metro. Life Ins. Co.*, 271 F. App'x 493, 500 (6th Cir. 2008). This court, moreover, will not mistakenly assume that hard physical diagnostic tools are the only legitimate source for evaluating a patient. Indeed, one thing that every physician connected to this case appears to have agreed on, at least implicitly, is that Boersma's subjective account of her own symptoms is a legitimate source of information for both diagnostic purposes and the purposes of assessing limitations. That does not mean, of course, that a patient's claims about her symptoms will always be determinative of contested medical questions; patients may lie or exaggerate, or

they may perceive their symptoms in an inaccurate or out-of-proportion way for personal or psychological reasons. At the same time, however, the defendants have not presented any evidence that would suggest that any other source of diagnostic information—whether testing, imaging, or something else—is so comprehensive and reliable as to render self-reporting of symptoms to be beside the point.[4] *See Combs v. Reliance Standard Life Ins. Co.*, 511 F. App'x 468, 471 (6th Cir. 2013) (noting that "a plan administrator must . . . determine how the objective medical evidence relates to the plaintiff's subjective symptoms"). To the contrary, every physician—even those who were ultimately skeptical of the severity of Boersma's self-reported symptoms—at least took Boersma's version of events into account, even if some ultimately rejected it as inconsistent with the evidence. The court, accordingly, cannot simply disregard Boersma's reports of her symptoms merely because they are, as all self-reporting of symptoms inherently must be, subjective.

In any event, Boersma has provided more than bare assertions of her symptoms. She has corroborated their severity with narrative evidence from her family members and opinions of the physicians who have a long history of treating her, as well as medical records that, although they do not show a condition that was always consistently as severe as she now claims that it is, do confirm that she has had long-standing complaints consistent with her current diagnosis. Boersma also provided an FCE seemingly confirming her disability, and the Sixth Circuit has recognized such FCEs as an appropriate "method of objective proof of disability" in fibromyalgia cases, particularly given that confirming the existence of the condition itself is so

---

[4] Indeed, the court notes that, when Dr. Lovette *did* receive objective documentation of a physical anomaly—Boersma's out-of-the-ordinary biopsy findings seeming to show neuropathy—Dr. Lovette, quite understandably, opined that such testing alone would not be sufficient to determine whether the patient suffered from impairments and would have to be evaluated "in the context of symptoms and clinical findings." (LTDR at 1198.)

difficult.[5] *Huffaker*, 271 F. App'x at 500. Additionally, as much as the defendants emphasize Boersma's unremarkable physical examinations, it is not, in fact, the case that the record is devoid of physical evidence suggesting that she has been suffering from a genuine ailment. For example, Dr. Pansuria, who was relatively skeptical of Boersma's claims, nevertheless acknowledged that Boersma's physically verifiable neuropathy was consistent with her suffering from fibromyalgia. That neuropathy, in and of itself, appears unlikely to be sufficient to support a disability claim—but the same would be true of, for example, an isolated blood test or x-ray corroborative of arthritis. When the court considers evidence corroborating a condition, what matters is not whether the particular corroborating details are themselves disabling, but, rather, what inference the details would support—allowing the beneficiary to demonstrate the disabling nature of the condition by other means. Boersma's neuropathy is at least potentially corroborative of the fact that she is not, in fact, malingering with regard to her fibromyalgia. Indeed, the defendants concede that, in addition to the neuropathy findings, Dr. Pansuria "f[ound] multiple tender points and affirmed [the] diagnosis of fibromyalgia." (Doc. No. 45 at 16.)

Accordingly, despite all of the defendants' arguments about the supposed lack of objective findings supporting a diagnosis, there does not actually appear to be much disagreement regarding the fact that Boersma has, in fact, presented evidence consistent with the

---

[5] As the defendants note, the FCE was performed outside the initial period of review considered by Unum in making its benefits determination. There is, however, no evidence that the condition documented in the FCE was meaningfully different from Boersma's condition at the time she applied for benefits. While it would be ideal to have an FCE performed right at the moment that an individual stopped work, one that is performed in a reasonably close period of time may still be relevant, at least in the absence of some reason to conclude that there was an intervening change in the beneficiary's health. *See Holden v. Unum Life Ins. Co. of Am.*, No. 1:19-CV-28-TAV-CHS, 2020 WL 6136223, at *4, *6 n.3 (E.D. Tenn. Oct. 19, 2020) (discussing "consideration of medical reports after the date of disability," depending on whether the reports reflect the "acute onset of new symptoms") (citing *Crespo v. Unum Life Ins. Co. of Am.*, 294 F. Supp. 2d 980, 994 (N.D. Ill. 2003)).

existence of a medical condition—fibromyalgia—regardless of whether that condition can be verified by medical tests. The meaningful disagreement, rather, is with regard to whether her condition is disabling. Accounts from Boersma's family and doctors appear to confirm that her symptoms make it effectively impossible for her to reliably work complete days, even in a sedentary position. In contrast, the explanations for why Boersma's fibromyalgia would *not* be disabling are mostly unpersuasive and based on the unsupported and conclusory assertion that a lack of corroborating physical manifestations of a disease necessarily establishes that disease's non-disabling nature. Dr. Norris, in particular, seems to have simply assumed that fibromyalgia can never be disabling for the purposes of a sedentary job. Neither Dr. Norris nor the defendants, however, has provided any support for such a conclusion—and, indeed, the defendants do not even try, instead attempting to pick isolated bits of Dr. Norris's analysis out to make it seem more nuanced than it actually was. *See Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (recognizing that "[s]ome people may have such a severe case of fibromyalgia as to be totally disabled from working"). Dr. Norris's conclusory rejection of the possibility that fibromyalgia might be disabling is particularly striking, given that he is not a rheumatologist and does not have meaningful expertise in the condition. *See* 29 C.F.R. § 2560.503-1(h)(3)(v) (stating that the insurer "shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment").

Finally, Boersma's own history of professional success and dedication to her career tends to weigh against any inference that she would falsify or exaggerate her symptoms to avoid her career responsibilities. Schwan, who supervised Boersma for three years and worked with her for more, said that Boersma had been a "dedicated" and "honest" employee with a "positive attitude." Schwan stated that she "wish[ed] that she had a dozen" of Boersma. (LTDR at 2678.)

It is, of course, possible for an employee to go from having exemplary performance to exaggerating symptoms to avoid work. The court, however, finds it more likely—particularly in light of the other evidence presented—that Boersma's career trajectory was disrupted by her symptoms, as she has described and as Schwan has corroborated.

The defendants devote a significant amount of briefing to arguing that the court is not required to give extra weight to the opinions of treating physicians in an ERISA benefits case. On that principle, the defendants are correct: the law is clear that the opinion of a treating physician "does not have to be afforded special deference." *Smith v. Cont'l Cas. Co.*, 450 F.3d 253, 262 (6th Cir. 2006). Indeed, treating physicians may have their own particular reasons for lacking credibility, particularly if the physician in question has a longstanding relationship with the plaintiff. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003) (noting that a "treating physician, in a close case, may favor a finding of" disability). Similarly, it is fair for the defendants to point out that Dr. Harwell did not give her full opinion until after the initial denial of Boersma's claim, raising the possibility that the opinion may have been crafted to support Boersma's arguments—although, of course, each non-treating physician, by definition, also reached his or her opinions in the context of Boersma's contested claims. *See Raskin v. UNUM Provident Corp.*, 121 F. App'x 96, 99 (6th Cir. 2005) (noting that the Sixth Circuit has "cautioned against giving significant weight to a doctor's supplemental opinion when that opinion follows the patient's denial of benefits and is issued without any justification for the change"). Each of these factors is relevant to the court's consideration of the competing expert conclusions.

By the same token, however, a court is under no obligation to ignore the fact that a treating physician's greater experience with a plaintiff may, depending on the context of the case,

16

provide that physician with a superior basis for making certain determinations. That may be particularly true where, as here, evaluating and interpreting the patient's own account of her symptoms is so important to her diagnosis. The court, in its evaluation of Boersma's claims, has considered both (1) the potential bias that Boersma's treating physicians might have based on their relationships to her and (2) those treating physicians' superior direct experience with Boersma, and the court has ultimately found the treating physicians' assessments to be credible. The court stresses that it made that determination based on the circumstances of the case—not an any automatic presumption afforded to treating healthcare providers over later file reviewers or examiners.

If this were another type of case—say, an ordinary breach of contract case that could be litigated outside the structure imposed by ERISA—the court might have the option of resolving these issues only after it or a jury could assess the credibility of Boersma and the various other witnesses in person. Because it is an ERISA case, however, the court is limited to the paper record. Based on that record, the court concludes that Boersma has carried her burden of establishing her disability for the purposes of the LTD and LI Plans, although the court acknowledges that the question is close. Ultimately, though, Boersma's symptoms, as she has documented and supported them, are simply too disruptive of her ability to regularly perform an ordinary work day or work week to permit her to serve in any position to which she would be reasonably fitted by training, education, or experience. The defendants' emphasis on the lack of objective corroborative findings is simply insufficient to rebut Boersma's case, in light of the well-established tendency of fibromyalgia to evade corroboration through imaging and testing.

The court recognizes that plan administrators often understandably struggle with benefits cases involving fibromyalgia, a condition that is poorly understood and that, due to its lack of

easily testable symptoms, lends itself to claims that depend, to a potentially uncomfortable degree, on the word of the beneficiary. But diseases and disorders do not care whether they present in a manner that lends itself to simple claims administration, and, unless the applicable plan provisions say otherwise, disabilities based on difficult-to-assess conditions are covered just as fully as disabilities based on easy-to-assess conditions are. All that any beneficiary, administrator, or court can do is approach these situations by applying the applicable plan provisions to the administrative record in light of the best medical understanding available, even if that understanding is evolving and incomplete. In this instance, Boersma has documented her disabling condition sufficiently to support her claims. The court, accordingly, will reverse Unum's determination and award Boersma her requested benefits.

## IV. CONCLUSION

For the foregoing reasons, the defendants' Motion for Judgment on the Administrative Record (Doc. No. 44) will be denied, and Boersma's Motion for Judgment on ERISA Record (Doc. No. 46) will be granted.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge